ANNIE HAWKINS v. GREAT NORTHERN RAILWAY COMPANY.[1]

March 5, 1909.

Nos. 15,880—(206).

**Negligence—Question for Jury.**

Plaintiff's intestate was killed while passing between cars on defendant's repair track by a collision between a car standing on that track and another pushed down by the switching train. It was the authorized custom for repair men to pass between the cars, and for defendant, when switching, to send a servant or servants ahead on the track to warn other employees on both sides of the track of the approach of the switch train. It is *held*, in view of the presumption that deceased, when attempting to cross the rails, was in the exercise of ordinary care and was not guilty of contributory negligence, that whether defendant was negligent in failing to give the customary signals, and whether plaintiff's negligence contributed to his injury, were for the jury.

**Charge to Jury—Misconduct of Counsel.**

There was no reversible error in the charge to the jury by the trial court, or in its refusal to grant a new trial because of misconduct of counsel.

Action in the district court for Ramsey county by the administratrix of the estate of Michael Hawkins, deceased, to recover $5,000 for

[1] Reported in 119 N. W. 1070.

his wrongful death. The case was tried before Hallam, J., and a jury which rendered a verdict in favor of plaintiff for the amount demanded. From an order denying defendant's motion for judgment notwithstanding the verdict or for a new trial, it appealed. Affirmed.

*M. L. Countryman,* for appellant.

*James R. Hickey,* for respondent.

JAGGARD, J.

Plaintiff's and respondent's deceased, a car repairer, was employed on defendant's and appellant's repair track. There were five of these tracks, numbering 1 on the north to 5 on the south, which lay parallel to each other and extending from east to west. Between the two most southerly tracks, 4 and 5, was a narrow tramway for the operation of a truck. The space between its rails was filled with planking. The cars needing repairs were brought from the lead track at the western extremity of the yard by a switch engine, and were deposited on the various repair tracks. When so placed, they were put in repair by crews. To do this work the cars were placed far enough apart— about three or four feet—to enable men to work around them and pass between them. If the men wanted any bolts, they would go between the cars to the bolt house north of the tracks. If they wanted any lumber, they would go across the tracks between the cars to the south of the tracks. Under the rules of the company, the cars which were being repaired could not be moved by the train crew or other cars switched against them. When the cars on a given track had all been repaired, a switch engine and crew were brought in on the lead from the west. The cars on that track were coupled up and returned to service out of the yard. This work of coupling up the repaired cars and pulling them out took place at any time of the day, but was preferably done during the noon hour, when the car repairers were away at lunch. On the day of the accident all the cars on repair track No. 4 were ready to be put back into service. The deceased had been working during the forenoon of the day of the accident on track 2, which was the second track from the north.

There was testimony that deceased ate his luncheon, as was customary, in the mill at the southwest corner of the repair yards, because of the shelter and warmth it afforded. This was about twelve o'clock.

Thirty minutes was the usual time allowed for luncheon. Deceased was killed about 12:30. The record does not determine positively whether, after eating luncheon, he went west on the plankway between tracks 4 and 5, and then north. It was the custom for the men to go between the cars after luncheon. "That was the usual way." Nor does the record determine positively that he had gone northerly to his work and had occasion to go south for materials. Other men, having finished their luncheon about the time of the accident, were returning to their respective places of work and were walking between tracks 4 and 5. The foreman, seeing the approach of these men, suspended switching operations for about five minutes, until all the men had passed by the point where the next coupling was to be made. Neither he nor the car repairer who was near him saw or heard anything of the deceased. Switching operations were resumed. The deceased was caught and killed between the drawbars of about the fourth car east of the one to which the foreman was engaged in making a coupling. The running out of the slack moved the cars farther east, so as to cause the collision.

1. The negligence of the defendant involved was the alleged failure on the part of the men engaged in switching on track 4 to give the usual and customary signal of warning. It was the duty of the inspector foreman to go ahead of the cars as they were being coupled and to give sufficient warning to the men that the cars were about to be moved; and it was his custom at all times to go far enough ahead of the cars to warn the men from both sides. The men were working on both sides and crossing through there all the time. "They have got to be warned. * * * I [witness, Foreman Tanner] always did, as a rule, keep ahead of my men two or three cars. Sometimes I would make the coupling all myself; other times one of the men would make them, and one would stay at the engine, and I would be still ahead of them walking down the track, opening knuckles, and hollering to everybody I see 'Look out.' We would proceed that way and couple up until we got to the end. * * * They [the car repairers] travel through there from one side to the other in carrying supplies from one track to another, and, while there are no men working on the track that you are coupling onto, they are dodging from one side to the other, going through there, and the foreman would walk

ahead down to warn everybody and give you a show to couple up with safety.  *  *  *  I would be proceeding towards the uncoupled cars."

It was practically admitted that, at and prior to the time of the accident, nobody was on the north side of the train to give any warning of any kind.  If the plaintiff's deceased came from the north, defendant's negligence is clearly made out.  Defendant's contention is that all the evidence indicates deceased was passing from the north to the south when he was caught.  As we read the record, however, it was more probable that he was passing from the south to the north.  That neither the foreman nor the inspector foreman saw deceased does not prove that he was passing from the north to the south; for the jury might have inferred that they were not properly on the lookout and that thus no warning may have been given.  Defendant has not expressly controverted this.  In this view there was enough for the jury to pass upon the question whether defendant negligently failed to give the usual warning.

If, however, it is assumed that plaintiff was coming from the south, the question was also for the jury.  It does not appear that the trial court was confused in failing to distinguish between what warning might or could have been given to the car repairers and what was usually and customarily given.  Whether the foreman was four cars and the inspector foreman three cars west of the place of the accident, both on the south side, and whether this location made possible the usual warning by defendant's servant, who was "ahead while walking on the track," were for the jury, although the custom did not exactly prescribe the proper distance ahead. . Moreover, the foreman himself testified as follows: "Well, I don't recall hearing [the inspector foreman] give any signal; but yet, at the same time, I will add that we had been talking to these men that were going up between the tracks, crowded them over, and it seemed as though we didn't move without saying something; but I don't remember, nor I didn't at the time, but we usually did in all cases."  It is true, subsequently, when asked by counsel for defendant, "As a matter of fact, you gave all the warning that it is customary for you to give when switching on that track?" he answered, "Yes, sir."  His testimony, taken as a whole, was plainly for the jury.  It would be palpable distortion to treat it as showing that the usual and customary signals were actually given.

In addition, there was testimony of the car repairers working on track 5 "that they did not see the usual and customary signal and warning given." The inference to be drawn from their testimony was fairly for the jury. "It was not necessary for plaintiff to show by an eye-witness exactly how these injuries were received in order to recover, and that is really what was demanded by defendant's counsel on the argument here. It is not necessary in any action, civil or criminal, that the material facts should be established by direct evidence. In civil cases it is sufficient if the evidence, on the whole, agrees with and supports the hypothesis which it is adduced to prove, and it is the duty of the jury to decide according to the reasonable probability of the truth." Lillstrom v. Northern Pacific R. Co., 53 Minn. 464, 55 N. W. 624, 20 L. R. A. 587.

2. The contributory negligence of the deceased was also for the jury. It must be assumed, in considering this controversy, that no warning had been given him. If he came from the north, it was for that body to determine whether he was negligent in not observing that the train was moving, and in proceeding, although no warning was given him. On this reasoning alone, plaintiff's negligence was for the jury.

If, however, deceased came from the south, the case does not present the familiar proposition that where there are two equally practical ways of doing work, and the one is safe and the other perilous, it may be contributory negligence as a matter of law not to use the safe one. It is true that deceased might have gone north at the east end of the tracks without any danger. But, if he had, he must afterwards have gone south and have been confronted by the same peril as if he had originally started north from the south. It is also true that he might have walked up the plank tramway track and across northerly with entire safety if defendant had given the usual signal. This is not the ordinary case in which it is dangerous to pass between cars in the process of being switched. The yard was a place where repairs were made, and where men were authorized to, and customarily did, pass between cars, even on the switching track. The deceased was not bound to anticipate negligence on the part of his master. The law, however, required him to use his faculties of observation. He was not, as a matter of law, free from contributory negligence.

The question was for the jury. Switching was in course of being

done. The jury might have found that deceased was negligent in not observing from existing conditions that it was dangerous to undertake to pass between the cars; but it found otherwise. Moreover, the presumption is that deceased "was exercising ordinary care and caution when attempting to cross the rails and that he was not guilty of contributory negligence." Lillstrom v. Northern Pacific Ry. Co., 53 Minn. 464, at page 468, 55 N. W. 624, at page 625, 20 L. R. A. 587. And see Hooper v. Great Northern Ry. Co., 80 Minn. 400, 83 N. W. 440 (in which the facts were somewhat similar to the facts in the instant case); Goff v. St. Louis, 199 Mo. 694, 98 S. W. 49, 9 L. R. A. (N. S.) 245; Axelrod v. New York, 109 App. Div. 87, 95 N. Y. Supp. 1072. But see Wiwirowski v. Lake Shore, 124 N. Y. 420, 26 N. E. 1023, at page 1024.

3. The remaining question, whether the trial court erred in not granting a new trial because of misconduct of plaintiff's counsel, who "in the ardor of his advocacy exceeded all proper bounds, and in the most inexcusable manner attempted to make the jury believe that the bell could not have been rung because, if it had been, the defendant would have produced the engineer and fireman to prove that fact."

No issue concerning the ringing of the bell was involved in the trial. The memorandum of the learned trial judge explains: "The remarks of counsel are evidently not accurately transcribed. Whatever they were, they were apparently prompted by some remark of counsel for defendant in his argument to the jury. What that remark was does not appear from the record. The court charged the jury specifically as to the negligence on which alone they could predicate a recovery, and in my judgment the remarks of counsel for the plaintiff could not prejudice the defendant." No sufficient reason appears for holding this view erroneous.

An assignment of error is addressed to a ruling on evidence. No prejudicial error is made to appear.

Affirmed.

On March 19, 1909, the following opinion was filed:

PER CURIAM.

After consideration of defendant's motion for reargument, we have found no reason for changing our original opinion that, in view of the

circumstances of the accident, of the direct evidence, limited as it was, and of the presumption that deceased was exercising due care, the question of defendant's negligence was for the jury and that plaintiff was not as a matter of law guilty of contributory negligence. Defendant has urged the assignment that the trial court erred in refusing to instruct the jury upon the issue of contributory negligence as defendant requested. The request was made after the court had completed its charge. Immediately thereupon the trial court gave further directions on the subject to which defendant made no objection and took no exception. Apparently it was satisfied. Apart from the question whether any basis exists upon which to rest the assignment of error—and we are not inclined to be technical in this regard—the charge of the court considered as a whole fairly presented the issue as to contributory negligence to the jury.

Motion denied and stay vacated.